UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DONNA MAY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SCHERING CORPORATION, *et al.*, )<br>)<br>Defendant )  | Civ. No. 09-170-B-W |

## RECOMMENDED DECISION

Donna May has sued her former employer, Schering Corporation, for employment discrimination, alleging age discrimination under the ADEA and the Maine Human Rights Act (Counts I & II), discrimination based on sex under federal and state law (Counts III & IV), sexual harassment prohibited by federal and state law (Counts V & VI), and retaliation for engaging in protected activity in violation of federal and state law (Counts VII & VIII). Schering Corporation has moved to dismiss Counts III, IV, V, and VI pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). I now recommend the court deny the motion.

### THE SECOND AMENDED COMPLAINT

There are no documents attached to the complaint and no other materials in the record[1] that are expressly incorporated into Ms. May's factual allegations. May relies entirely on the allegations found within the four corners of her second amended complaint to support her claims. For purposes of the pending motion to dismiss, the following allegations are accepted as true.

---

[1] Schering Corporation purports to attach to its motion a copy of the charge submitted to the Maine Human Rights Commission (Mot. to Dismiss at 1 n.2), but it failed to do so.

Schering Corporation hired Plaintiff Donna May as a sales representative on or about March 16, 1998.  (Second Am. Compl. ¶ 11.)  May began her career at Schering as a level 1 sales representative.  (Id. ¶ 15.)  In 2000, May received a promotion to level 2 sales representative, which promotion occurred soon after May became eligible for promotion.  (Id. ¶ 16.)  Promotion is not automatic at Schering Corporation and is based on merit and above average ratings.  (Id. ¶ 17.)  In 2004, May received a promotion to level 3 sales representative.  (Id. ¶ 18.)  May understood she was the only level 3 sales representative in the Manchester District.  (Id. ¶ 19.)

During her tenure at Schering, May was consistently an above average sales representative with strong sales skills and strong product knowledge.  (Id. ¶ 12.)  In her entire career at Schering, May was never ranked lower than third among the sales representatives in her district.  (Id. ¶ 13.)  In 2007, May was the number one sales representative in her district.  (Id. ¶ 14.)  During her employment, May earned numerous awards given by Schering.  (Id. ¶ 20.)  May earned a Shining Performance Award due to the fact that during October and November 2007 May's sales results for Vytorin and Zetia achieved certain "Move the Needle" objectives.  (Id. ¶ 21.)  May's territory was one of only 72 territories out of more than 1,000 to achieve this goal.  (Id. ¶ 23.)  Between 2004 and 2007, May was given no less than eight awards for her sales, teamwork and business integrity.  (Id. ¶ 24.)  One of these awards, "Spotlight on Performance," was given to her by Defendant Katie Kardinal on August 24, 2007, for May's superior sales results.  (Id. ¶ 25.)  In 2004, May was named Sales Representative of the Year.  (Id. ¶ 26.)

In addition to the mandatory duties of her position, May voluntarily took on some other supervisory responsibilities which fell outside of the scope of her standard duties.  (Id. ¶ 32.)  For example, May began training and mentoring sales representatives starting in 2000.  (Id.

¶ 33.)  May also voluntarily accepted full responsibility for setting, controlling and overseeing the budget of her sales district in 2006 and 2007.  (Id. ¶ 34.)  In June of 2007, May was asked by Joseph Caruso, her acting manager at that time, to continue managing the budget and she agreed to do so.  Caruso commented to May that she was doing a great job and that she was the only one in the district executing the budget properly.  (Id. ¶ 35.)  May subsequently began getting calls from other managers in the district for advice and prepared a powerpoint presentation to be distributed to managers with step-by-step instructions on how to manage their budgets properly.  (Id. ¶ 36.)  Since the discharge of the plaintiff, the sales objectives of the plaintiff's position have been lowered.  (Id. ¶ 135.)

Approximately six months prior to her discharge, May came under the direction of a new supervisor, defendant Katie Kardinal, someone May had previously mentored.  (Id. ¶¶ 37-38.)  Ms. Kardinal, as a thank you gift for the prior mentoring, had presented May with a book entitled "Hot Sex:  How to Do It."  (Id. ¶ 39.)  Kardinal had previously invited May to "sex toy parties" though May had declined these invitations.  (Id. ¶ 40.)  Kardinal had a reputation in the company for hosting sex toy parties for employees of Schering in her home and regularly extended invitations to these parties at employer-sponsored gatherings.  (Id. ¶ 41.)  On information and belief, these sex toy parties were well known to upper management and upper management did nothing to curb the sex toy parties hosted by Kardinal or the invitations extended by Kardinal while she was at work.  (Id. ¶ 42.)

One of the first things Kardinal sought from May after Kardinal became May's supervisor was May's date of birth.  (Id. ¶ 43.)  May provided Kardinal with her date of birth.  (Id. ¶ 44.)  Kardinal frequently commented on May's age and appearance.  (Id. ¶ 45.)  Kardinal repeatedly stated to May that she looked younger than her actual age.  (Id. ¶ 46.)  Kardinal

repeatedly stated to May that she could not believe that May had children in college.  (Id. ¶ 47.) Kardinal repeatedly stated to May that she could not believe that May had been married for 25 years.  (Id. ¶ 48.)   The comments regarding May's age and appearance made May very uncomfortable.  (Id. ¶ 49.)  May requested that Kardinal stop the personal comments but Kardinal failed to relent.  (Id. ¶ 50.)

Both before and after becoming May's supervisor, Kardinal frequently shared stories of her sexual exploits with May.  (Id. ¶ 51.)  Kardinal always informed May of the men Kardinal was dating.  (Id. ¶ 52.)  May recalls that at one point Kardinal was dating a NASCAR driver and Kardinal referred to him as her "Boy Toy."  (Id. ¶ 53.)  Kardinal discussed with May how much she enjoyed providing new sexual experiences to her inexperienced "Boy Toy."  (Id. ¶ 54.)  May was uncomfortable with Kardinal's inappropriate sexual banter, complained about it to Kardinal, and discouraged Kardinal from continuing to share her exploits.  (Id. ¶ 55.)

In July 2007, Kardinal requested that May accept the position of Mentor for the Manchester District.  (Id. ¶ 60.)   As May had extensive experience training and assisting her peers, she agreed.  (Id. ¶ 61.)  Kardinal told May that the appointment would assist May in achieving a promotion to a level 4 senior sales representative.  (Id. ¶ 62.)  At the time and many times afterwards, Kardinal stated to May, "This will be the year of Donna May."  (Id. ¶ 63.) Kardinal stated that the appointment would be formally rolled out at the Plan of Action (POA) meeting in August.  (Id. ¶ 65.)   In the interim, Kardinal immediately suggested that other sales representatives take advantage of May as a mentor resource.  (Id. ¶ 66.)  May began accepting phone calls from the newer sales representatives in the Manchester District seeking advice and counseling pending her official appointment as District Mentor.  (Id. ¶ 67.)  Kardinal also began

4

using May as a resource calling her frequently and sharing information about other team members on an almost daily basis.  (Id. ¶ 68.)

Kardinal frequently referred to May as "Waldorf" and another older employee as "Statler," both privately and in front of other sales representatives.  (Id. ¶ 101.)  Kardinal's e-mails to May occasionally used the nickname "Waldorf" to refer to May.  (Id. ¶ 102.)  At one point, Kardinal e-mailed May a link to a television commercial in which the Muppett characters Waldorf and Statler appeared.  (Id. ¶ 103.)   Prior to the email, May did not understand who "Waldorf" was or why Kardinal had tagged her with that nickname.  (Id. ¶ 104.)  According to Wikipedia, Waldorf and Statler are "two ornery, disagreeable old men who first appeared in the television series *The Muppet Show* heckling the rest of the cast from their balcony seats."  (Id. ¶ 105.)  The commercial confirmed to May that the Waldorf reference was a reference to a Muppett who was old and disagreeable.  (Id. ¶ 106.)  May tried to stay positive but the continuous Waldorf references upset May and felt very degrading to May.  (Id. ¶ 107.)  According to May, the reference to May as "Waldorf" and her co-worker as "Statler" was clearly a reference to May's age and reflected Kardinal's animus towards May.  (Id. ¶ 108.)

Kardinal frequently signed her emails to May "Mini Me."  (Id. ¶ 109.)  The nickname "Mini Me" was disturbing to May as she felt that it bordered on stalking May.  (Id. ¶ 110.)

In June 2007, May explored the possibility of obtaining from Schering Corporation a medical transfer to Ohio.  (Id. ¶ 56.)  She discussed this possibility with defendant Joseph Caruso.  (Id. ¶ 57.)  May's husband is a disabled veteran and May wanted to know if May could qualify for such a transfer for that reason.  (Id. ¶ 58.)  May and her husband are originally from Ohio and had hoped to eventually return to Ohio although they had no immediate plans to return to Ohio.  (Id. ¶ 59.)  In August at the POA meeting, May was not appointed as District Mentor,

5

as Kardinal had suggested would happen.  (Id. ¶ 69.)  When May inquired, Kardinal stated to May that Caruso, Kardinal's direct supervisor, had decided that May had already "checked out" based on May's exploration of a medical transfer.  (Id. ¶ 70.)   Kardinal also told May that May would not have wanted a transfer if May knew Kardinal was going to be May's boss.  (Id. ¶ 64.)

      The individual who obtained the District Mentor position was a male, Josh Lewis, who had less sales experience and less training experience than May and who was younger than May.  (Id. ¶ 71.)  Kardinal told May that Lewis regularly failed to work Mondays and Fridays in the month April of 2007, but that Caruso was grooming Lewis for a leadership role.  (Id. ¶ 72.)  At the time of his appointment, Lewis was not meeting the sales goals set for his position at Schering.  (Id. ¶ 73.)

      After Kardinal became May's supervisor, May advised Kardinal that she had experienced some strained interactions with Clinton Higgins, her counterpart at Merck.  (Id. ¶ 74.)  Higgins had been rude and inappropriate in both discussions with and phone messages to May.  (Id. ¶ 75.)  May was not the only Schering employee who had trouble dealing with Higgins.  (Id. ¶ 76.)  Jude Violette, a male co-worker and the younger partner of May, had also advised Kardinal that he had difficulty working with Higgins.  (Id. ¶ 77.)  Caruso had already discussed the issue with his counterpart at Merck and May believed that the issue had already been addressed.  (Id. ¶¶ 78-79.)  However, at the POA meeting in August, Kardinal demanded that May file a report regarding Higgins with a private and anonymous hotline used by Schering's human resources department.  (Id. ¶ 80.)  Kardinal threatened May with a below expectations rating on her next review if May refused to report Higgins using the hotline.  (Id. ¶ 81.)  Kardinal promised May that the call would be confidential and May advised Kardinal that Caruso was already aware of the situation involving Higgins.  (Id. ¶ 82.)  Kardinal insisted that

6

May come to Kardinal's hotel room to make the telephone call under the ruse that May would have privacy in Kardinal's hotel room.  (Id. ¶ 83.)  May was aware that during previous POA meetings, Kardinal had been found engaging in sexual activities in her hotel room with other married co-workers.  (Id. ¶ 84.)  Given the comments Kardinal made about May's appearance, the history of invitations to sex parties, and the prior gift of the book "Hot Sex:  How to Do It," May felt uncomfortable going to Kardinal's hotel room alone.  (Id. ¶ 85.)  However, May did as demanded by Kardinal and went to Kardinal's hotel room to report Higgins in a call to the hotline.  (Id. ¶ 86.)   Kardinal did not demand that Jude Violette report Higgins in this manner.  (Id. ¶ 87.)  Nor did Kardinal insist that Jude Violette come to her hotel room privately.  (Id. ¶ 88.)  The day after calling the hotline, Kim Constantine in Schering's human resources department called May to obtain more information about the supposedly anonymous call made the prior day.  (Id. ¶ 89.)  Kim Constantine acknowledged to May that Katie Kardinal had informed them that May was the caller to the hotline.  (Id. ¶ 90.)

     Despite reporting Higgins as demanded, Kardinal still gave May an unjustified "below expectations" on May's next performance evaluation.  (Id. ¶ 91.)  On September 7, 2007, May received her Mid-Year 2007 Review.  (Id. ¶ 92.)   May's territory had not made 100% of its portfolio, but no other team in May's district had either.  (Id. ¶ 93.)  While May's evaluation was similar to prior evaluations, May was given an overall rating of "below expectations" that was inconsistent with her prior ratings.  (Id. ¶ 94.)  May had never received an overall rating of "below expectations."  (Id. ¶ 95.)  This rating was not justified since May's performance was consistently better than that of her colleagues and had, in fact, been improving over the course of the year.  (Id. ¶ 96.)  May was told at the time that a plan to improve her numbers would be discussed at a later date.  (Id. ¶ 97.)  Despite her superior sales performance, sometime in

October 2007, May was placed on a performance improvement plan by Kardinal for May's allegedly poor performance. (Id. ¶ 98.) Other (younger) employees whose performance was rated "below expectations" were not placed on performance improvement plans. (Id. ¶ 99.) Soon after Kardinal placed May on the performance improvement plan, Charles Ziakas, vice president of sales at Schering, awarded May a Shining Performance award for her superior sales efforts. (Id. ¶ 110.)

Sometime in November 2007, May accessed her company evaluations on line. (Id. ¶ 111.) May was stunned and outraged to discover that after she signed an official copy of her Mid-Year 2007 Review dated September 7, 2007, Kardinal had made changes in her evaluation without the knowledge and consent of May. (Id. ¶ 112.) The changes made by Kardinal were made without May's knowledge and caused May to be more poorly rated than in the original evaluation. (Id. ¶ 113.) On December 29, 2007, May sent to Charles Ziakas, vice president of sales, a lengthy memorandum reporting the inappropriate and unlawful actions of her supervisors. (Id. ¶ 116.)

On December 13, 2007, May was advised by her doctor that she was not able to work due to a medical condition caused by discriminatory acts in the workplace. (Id. ¶ 114.) On December 17, 2007, May took a leave of absence due to the stress she was feeling from the unfair and unlawful actions of Schering, Kardinal, and Caruso. (Id. ¶ 115.) When May reported back to work on January 2, 2008, May was told without any explanation that she had been put on administrative leave. (Id. ¶ 117.) On January 31, 2008, May received a voice mail at her home from Kardinal stating May was required to attend a meeting scheduled for February 5, 2008. (Id. ¶ 118.) In her message, Kardinal represented to May that the meeting was to discuss May's steps to return to the field. (Id. ¶ 119.) On that same day, May confirmed in a subsequent phone

conversation with Kardinal that the intent of the company was to put her back into the field.  (Id. ¶ 120.)

On February 4, 2008, May went to a previously scheduled doctor's appointment.  (Id. ¶ 121.)  May's doctor advised her that she was still not well enough to return to work.  (Id. ¶ 122.)  On February 4, 2008, at about 4:30 p.m., May left Kardinal a voice mail that she would fax a doctor's note that she was still unable to work due to her medical condition and could not attend the meeting the following day.  (Id. ¶ 123.)  May attempted to fax the letter but it did not get successfully transmitted.  At or about 5:23 p.m. on February 4, 2008, May sent Kardinal a text message to let her know that the fax did not go through.  (Id. ¶ 124.)  Kardinal sent a reply text message advising May to bring the document to the meeting.  (Id. ¶ 125.)  May did not attend the meeting based on the advice of her doctor.  (Id. ¶ 126.)  May sent the letter by overnight express on February 6, 2008, the earliest date May was able to send the document.  (Id. ¶ 127.)  In addition, May filed a claim of disability on that date with Schering's short term disability insurer.  (Id. ¶ 128.)

Schering made the decision to discharge May during a period of time when she was disabled by a condition caused by the actions of Schering and its staff.  (Id. ¶ 129.)  Schering and/or its staff failed to promote May and instead promoted a younger, less qualified male.  (Id. ¶ 130.)  The actions and inactions of Kardinal were done with the knowledge and consent of her direct supervisor, defendant Joseph C. Caruso.  (Id. ¶ 132.)  Schering tolerated the conduct of its employees and did not take immediate appropriate and reasonable corrective measures to eliminate the discrimination against the plaintiff.  (Id. ¶ 133.)  Schering discharged May while retaining other younger employees who by all objective standards had inferior sales performance records.  (Id. ¶ 148.)  Schering left May's position open for a period of time, then replaced May

with a female employee with a lower level rating than May received after May complained that she had been discriminated against on the basis of her gender. (Id. ¶ 149.)

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(6), the procedural vehicle for the defendant's motion, provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted." In deciding a motion to dismiss, the court accepts as true the factual allegations of the complaint, draws all reasonable inferences in favor of the plaintiff that are supported by the factual allegations, and determines whether the complaint, so read, sets forth a plausible basis for recovery. Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008). To properly allege a claim in federal court, it is not enough merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

A plaintiff's complaint must be supported by sufficient factual allegations to be "plausible" under Twombly, but a plaintiff is not required to prove her entire case in her pleadings. Chao v. Ballista, 630 F. Supp. 2d 170, 177 (D. Mass. 2009). Evaluating "plausibility" is a highly contextual enterprise. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) ("[T]he court's assessment of the pleadings is context-specific, requiring the reviewing court to draw on its judicial experience and common sense.") (internal quotation marks omitted). The factual allegations need not be elaborate, but they must be minimally sufficient to show a plausible entitlement to relief so that the defendant will have "fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited

exceptions."). Elaborate pleading of specific facts necessary to establish a prima facie case of employment discrimination is not required. See, e.g., Fowler v. Scores Holding Co., No. 08-Civ.-7796 (VM), 2009 U.S. Dist. Lexis 122191, *6-7, 2009 WL 5178475, *2 (S.D.N.Y. Dec. 28, 2009) (Marrero, J.) ("[W]hile a complaint need not contain specific facts establishing a prima facie case of employment discrimination to overcome a Rule 12(b)(6) motion, the claim must be facially plausible, and must give fair notice to the defendants of the basis for the claim."); Harper v. New York City, Housing Auth., No. 09-Civ.-5303 (SHS), 2009 U.S. Dist. Lexis 105427, *7-9, 2009 WL 3861937, *2 (S.D.N.Y. Nov. 6, 2009) (Stein, J.) (same); Everett v. Liberty Healthcare Sys., LLC, No. 09-0683, 20009 U.S. Dist. Lexis 111191, *5-6, 2009 WL 4456290, *3 (W.D. La. Oct. 20, 2009); Gillman v. Inner City Broad. Corp., No. 08-Civ.-8909, 2009 U.S. Dist. Lexis 85479, *11-12, 2009 WL 3003244, *3 (S.D.N.Y. Sept. 18, 2009) (Preska, C.J.) (same); Zustovich v. Harvard Maint., Inc., No. 08-Civ.-6856 (HB), 2009 U.S. Dist. Lexis 22640, *12-13, 2009 WL 735062, *5 (S.D.N.Y. Mar. 20, 2009) (Baer, J.) (same). However, "Rule 8 [of the Federal Rules of Civil Procedure] does not empower [a plaintiff] to plead the bare elements of [her] cause of action, affix the label 'general allegation,' and expect [her] complaint to survive a motion to dismiss." Iqbal. 129 S. Ct. at 1954.

## DISCUSSION

Schering has moved to dismiss all four counts that allege sex discrimination, contending first, that the alleged facts do not support a prima facie case of work place harassment under either Title VII or the Maine Human Rights Act (Counts V and VI). Second, Schering claims May's sex discrimination counts (Counts III and IV) fail because May has not alleged sufficient facts to support a plausible inference that she was discriminated against because she was female. The pleadings and arguments in this case underscore the inevitable tension between Rule 8(a)'s

simplified pleading directive and the Iqbal "plausibility" requirement when brought to bear in the highly charged context of workplace discrimination. Defendant is asserting not that May has merely alleged the threadbare elements of the cause of action, followed by legal conclusions, but rather, that her factual assertions, even if true, do not present a *plausible* claim of gender discrimination and/or hostile work environment. For reasons that follow, the motion should be denied.

### A.     The Sex Discrimination Claims

In Counts III and IV, Ms. May alleges that she was terminated from employment and received other materially adverse treatment because of sex, in violation of both federal and Maine law. (Second Am. Compl. ¶¶ 165, 172.) The standard for liability is the same under either Title VII or the Maine Human Rights Act. Both statutes prohibit discrimination in employment on the basis of sex. 42 U.S.C. § 2000e-2; 5 M.R.S. § 4572(1). Moreover, "[b]ecause the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA." Winston v. Me. Technical Coll. Sys., 631 A.2d 70, 74-75 (Me. 1993). See also Doyle v. Dep't of Human Servs., 2003 ME 61, ¶ 14 n.7, 824 A.2d 48, 54. Where sex discrimination is concerned, it is appropriate to determine both the federal claim and the Maine claim pursuant to the same analysis. Berry v. City of S. Portland, 525 F. Supp. 2d 214, 227 (D. Me. 2007).

In the absence of direct evidence that sex was used as a factor in an employment decision, proof of sex discrimination ordinarily requires the plaintiff to demonstrate, among other things, the *prima facie* elements of a claim. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (establishing the burden of proof for summary judgment contests). The prima facie showing entails a showing that (1) the plaintiff is a member of a protected class;  (2) the

plaintiff's employer took an adverse employment action against her; (3) the plaintiff was qualified for the employment she held; and (4) the plaintiff's position remained open or was filled by a person whose qualifications were similar to his. Id. at 802; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999) (involving national origin discrimination).

Schering Corporation argues that May's sex discrimination claims must be dismissed because her complaint does not "plausibly assert that she suffered an adverse employment action (because of her sex) and that Schering treated her differently from any other similarly situated male employees." (Mot. to Dismiss at 15.) As for an adverse employment action, Schering Corporation terminated Ms. May's employment and, according to the allegations, did so based on bogus evaluations. Nevertheless, says Schering Corporation, May fails to clearly allege which similarly-situated male employee in the organization received preferential treatment in comparison to the treatment she received. (Id. at 17-18.) In fact, May's complaint indicates that a less qualified male applicant for the District Mentor position was selected over her just a few months before Ms. Kardinal started to place unwarranted negative evaluations in May's file. It also includes allegations that lower standards of performance were tolerated for other sales personnel, both male and female. These allegations are sufficient to ring the adverse employment action bell for purposes of pleading a claim. Nevertheless, Schering Corporation still maintains that the allegations are insufficient to raise a plausible entitlement to relief because there is no particular explanation as to why being a woman had any relationship to what happened to May, particularly as she had a female supervisor and was eventually replaced by another woman. (Reply Mem. at 7.)

It is not entirely surprising that Schering Corporation is taking the Rule 12(b)(6) approach in regard to the sex discrimination claims, even though it fails to seek the dismissal of

the balance of the case. On one potential reading of the complaint, there is an appearance that the sex-related claims are opportunistic in nature, due to the fact that May is female. On this point, I agree with Schering Corporation that a complaint should suggest to the Court a plausible basis for inferring that gender had something to do with the employee's troubles at work and I am not persuaded by May's counter-argument that Rule 12 only requires her to allege that she is female and suffered an adverse employment action. (Pl.'s Opposition at 15.) All the same, May's second amended complaint indicates well enough that she is not merely alleging sex discrimination because she is female. She also advances a sex-based theme related to Ms. Kardinal's alleged sexual gregariousness, which, viewed in the light most favorable to May, could plausibly place another woman at a disadvantage for failing to play along and get involved in sex-themed activities. More importantly, this theme is backed up with factual allegations concerning Ms. Kardinal's predilections, including interjecting sexual innuendo into the workplace, and her disparagement of May as a fuddy-duddy ("Waldorf"), plausibly for not playing along. These allegations are sufficient to raise a plausible entitlement to relief even if the allegations ultimately would not be sufficient to *prove* that matters of sex contributed to May's downfall at Schering Corporation.

## B.   The Sexual Harassment / Hostile Work Environment Claims

In Counts V and VI, Ms. May alleges two grounds for finding sexual harassment in the workplace. One allegation is that her termination from Schering occurred "because of May's refusal to accede to Kardinal's sexual advances." (Second Am. Compl. ¶¶ 178, 181.) The other allegation is that Ms. Kardinal subjected her to a hostile work environment. (Id. ¶¶ 177, 180.) Both Title VII and the Maine Human Rights Act prohibit sexual harassment in the workplace. As alleged, the theory of liability stated in paragraphs 178 and 181 is directly tethered to May's

termination.  If Ms. May can establish a causal relationship between her termination and her rejection of Ms. Kardinal's alleged advances, she will succeed on this claim against Schering Corporation because it involves a tangible employment measure.  Burlington Indus. v. Ellerth, 524 U.S. 742, 760-62 (1998).  Ms. May flatly alleges that she refused to accede to Kardinal's sexual advances.  Although she does not elaborate with respect to the frequency or nature of these advances, she has offered a factual allegation that Ms. Kardinal made sexual advances to her.  The rules of pleading do not demand that she itemize every incident.  As for Ms. Kardinal's motivation, Ms. May is permitted to allege motivation in general terms and she has sufficiently alleged that Ms. Kardinal enjoyed supervisory authority with respect to her employment.  Schering Corporation is clearly put on notice that this theory depends on an allegation that Ms. Kardinal undermined Ms. May's career at Schering Corporation based on animus arising from Ms. May's rejection of Ms. Kardinal's advances.[2]  The complaint is minimally sufficient to raise a plausible claim.

       The most vulnerable component of Counts V and VI, in my view, is the hostile environment theory.  In the wake of Iqbal, it is necessary to conclude that a plaintiff will not be able to allege that she experienced severe and pervasive harassment in the workplace (absent some tangible employment measure) without also providing some specific allegations suggesting the plausible presence of severe or pervasive, offensive or abusive conduct.  In order for sexual harassment to give rise to an actionable hostile work environment, the conduct must be "severe or pervasive."  Ellerth, 524 U.S. at 753; Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  This standard requires the Court to assess "the totality of the circumstances, including

---

[2] It is not plain where the dividing line is between Ms. May's sex discrimination claims in Counts III and IV and her tangible employment action "harassment" claims in Counts V and VI, but that is not a sufficient justification to dismiss the harassment claims.  The appearance is that Counts III and IV concern Ms. Kardinal's alleged disaffection with Ms. May's sexual—or insufficiently sexual—nature, whereas Counts V and VI concern a quid pro quo harassment based on the rejection of alleged "advances."

15

'the frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance."  Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)).

      Ms. May argues that she has alleged enough to overcome the motion.  She observes that it is not only sexually-charged conduct that matters for purposes of determining pervasiveness and severity, but also non-sexual conduct carried out on account of the sex factor.  There is solid support for this proposition and May is entitled to aggregate additional, nonsexual conduct, "such as work sabotage, exclusion, denial of support, and humiliation," to plead her cause.  Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 472 (1st Cir. 2002) (quoting O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001)).  In this regard, May supplements her allegations of sexual advances, invitations to sex-toy parties, and sexual exploit stories with allegations concerning comment on her appearance, her ability to remain married for an appreciable duration, insulting nicknames, daily telephone calls, what might be regarded as borderline domineering or fetishistic e-mail salutations ("Mini Me"), a threat to give a negative evaluation unless May would come to Kardinal's hotel room, and a betrayal of trust following May's compliance. (Pl.'s Opposition at 8-9.)  The persistent annoyance of the lower-intensity events, in May's view, significantly exacerbated the impact of the sexually-charged conduct.  (Id.)  Moreover, it is apparent from the complaint that May regarded the visit to Kardinal's hotel room as a threatening scenario.  Coming as it did toward the end of a long period of annoyances and alleged sexual provocation, it is at least plausible that this event was of greater severity than it might otherwise seem from the relatively tepid language of the complaint, regardless of whether any pass or offensive physical contact ensued at the hotel room.  On balance, although I am not prepared to conclude

that this list of occurrences would clear the severe and pervasive hurdle at the summary judgment stage, I recommend that the Court let the hostile environment theory move forward based on these factual allegations. I am also of the opinion that the plausibility of the other sex discrimination theories in this case tends to recommend the plausibility of this additional theory as well, even though the hostile environment theory seems more susceptible to dismissal than the other claims.

## CONCLUSION

For the reasons stated above, I RECOMMEND that the Court DENY Defendant's Motion to Dismiss (Doc. No. 15).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 26, 2010